# NO. 12-18-00326-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 392ND* |
| *B.S. AND M.R.,* | § | *JUDICIAL DISTRICT COURT* |
| *CHILDREN* | § | *HENDERSON COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

B.S. appeals the termination of her parental rights. In one issue, she challenges the legal and factual sufficiency to support the termination order. We affirm.

### BACKGROUND

B.S. is the mother and C.C.[1] is the father of B.S.1[2] and M.R. On July 31, 2017, the Department of Family and Protective Services (the Department) filed an original petition for protection of B.S.1 and M.R., for conservatorship, and for termination of B.S.'s and C.C.'s parental rights. The Department was appointed temporary managing conservator of the children, and the parents of the children were appointed temporary possessory conservators with limited rights, duties, access, and possession.

At the conclusion of the trial on the merits, the trial court found, by clear and convincing evidence, that B.S. engaged in one or more of the acts or omissions necessary to support termination of her parental rights under subsections (D), (E), and (O) of Texas Family Code

---

[1] At the conclusion of the trial on the merits, the trial court found, by clear and convincing evidence, that C.C. engaged in one or more of the acts or omissions necessary to support termination of his parental rights under subsections (N) (constructive abandonment) and (O) (compliance with a court order) of Texas Family Code Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between C.C., B.S.1, and M.R. is in the children's best interest. Based on these findings, the trial court ordered that the parent-child relationship between C.C., B.S.1, and M.R. be terminated. The father is not a party to this appeal.

[2] The mother's initials and the oldest child's initials are the same. We will refer to the oldest child as B.S.1.

Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between B.S., B.S.1, and M.R. is in the children's best interest. Based on these findings, the trial court ordered that the parent-child relationship between B.S., B.S.1, and M.R. be terminated. This appeal followed.

**TERMINATION OF PARENTAL RIGHTS**

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2018); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1) (West Supp. 2018); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2018); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

STANDARD OF REVIEW

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

## TERMINATION UNDER SECTION 16.001(b)(1)(E)

In her sole issue, B.S. argues the evidence is legally and factually insufficient to terminate her parental rights pursuant to subsection (E) of Texas Family Code Section 161.001(b)(1).

**Applicable Law**

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E) (West Supp. 2018). Scienter is not required for an appellant's own acts under Section 161.001(b)(1)(E), although it is required when a parent places her child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex.

App.—Houston [14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

"Endanger" means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Svcs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811. Termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Endangering conduct is not limited to actions directed towards the child. *Boyd*, 727 S.W.2d at 533. It necessarily follows that the endangering conduct may include the parent's actions before the child's birth and while the parent had custody of older children, including evidence of drug usage. *See id.* (stating that although endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the parent's conduct be directed at the child or that the child actually suffers injury); *see also In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied) (holding that courts may look to parental conduct both before and after child's birth to determine whether termination is appropriate). Further, the conduct may occur before the child's birth and both before and after the child has been removed by the Department. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

A parent's use of narcotics and its effect on her ability to parent may qualify as an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see also In re R.W.*, 129 S.W.3d at 739. Further, evidence that the parent continued to use illegal drugs even

4

though the parent knew her parental rights were in jeopardy is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being. *See* *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.--Fort Worth 2011, pet. denied); *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Though imprisonment of a parent is insufficient, standing alone, to constitute "engaging in conduct which endangers the emotional or physical well-being of the child," it is a factor to consider on the issue of endangerment. *See* *Boyd*, 727 S.W.2d at 533–34; *In re M.D.S.*, 1 S.W.3d at 199. Nonetheless, evidence showing a course of conduct that routinely subjects a child to the probability that he will be left alone because his parent is once again jailed, whether because of the continued violation of probationary conditions or because of a new offense growing out of a continued use of illegal drugs, or because the parent is once again committed to a rehabilitation program, endangers both the physical and emotional well being of a child. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.-San Antonio 1998, pet. denied).

<u>Analysis</u>

This case began after B.S. pleaded guilty on December 29, 2011, to a felony robbery charge and was placed on community supervision. During her community supervision, she tested positive in May 2017 for drug use and signed an affidavit admitting that she used methamphetamine. On July 20, 2017, Brandy Friendly, a Department investigator, came to B.S.'s house. Friendly testified that the Department received an intake regarding B.S. that concerned neglectful supervision of both children. She interviewed B.S. outside the home because the children were inside napping. During the interview, B.S. admitted to a history of methamphetamine use and told Friendly that she had been clean for two years and three months. Friendly asked B.S. to submit to drug testing because of the drug use allegations. B.S. agreed. Friendly returned to her vehicle because she needed to show B.S. where the drug testing facility was located. About fifteen minutes later, B.S. left the house with M.R. and walked across the street. When she returned, she had a bag with an unknown item in it. B.S. went into the home for a while longer and then put the children in the vehicle. Friendly believed that she waited, in total, roughly one hour. She also noticed that B.S. had a bandana on her head and when they arrived at the drug testing facility, noticed that B.S. had shaved her head as well as the children's hair. B.S. had not completely shaved the children's hair and there was enough available for drug testing. At trial, B.S. admitted

that she shaved her head and the children's hair. She believed it was necessary because she knew she would test positive for illegal drugs that day.

After Friendly and B.S. arrived at the drug testing facility, B.S. changed her mind and refused to submit to drug testing or allow her children to be drug tested. She left the facility with her children. Friendly's supervisor informed B.S. that she would need to place the children out of the home and she agreed to place them with her aunt. The children were placed with B.S.'s aunt from July 21, 2017, through July 31, 2017. Further, the children were drug tested on July 21, 2017. On July 31, 2017, the Department held a family team meeting in which it was disclosed that B.S. and M.R. tested positive for methamphetamine. Also, B.S.'s aunt stated that she no longer wanted to be a placement for the children due to a conflict with B.S. Thus, the children were placed in foster care.

*Department involvement.* In 2009, the Department became involved after an incident between B.S. and C.C. She and C.C. had an argument on the side of the road during which law enforcement was called. She admitted using methamphetamine at that time. B.S.1 was removed from her care. She completed her service plan including counseling, outpatient substance abuse rehabilitation, and a psychological evaluation. The Department returned B.S.1 to her.

In 2015, the Department became involved after she had to take B.S.1 to the hospital. He "split" his head open after he hit his head on the stairs during a party. She denied that they were sliding down the stairs in a laundry basket. B.S. tested positive for methamphetamines and both children were placed in foster care. M.R. was six months old at the time. She had to complete a service plan including outpatient rehabilitation, individual counseling, and a psychological evaluation. The children were returned to her care in 2016.

*Criminal History.* B.S. admitted that she was placed on community supervision sometime after 2011 for a felony robbery conviction. At the time of trial, she was still on community supervision. She was aware that if she violated the terms of her community supervision, she would be imprisoned. B.S. stated that when she relapsed in 2015, she informed her community supervision officer, asked for help, and received outpatient rehabilitation. She stated that she did not fear that her community supervision would be revoked.

*Drug Use.* According to B.S., she began using methamphetamine when she was thirteen years old and used for about two years. She was clean for nine years before relapsing in 2004. She stated that her relapse was "short-lived," and she was clean until 2009, the start of her first case

6

with the Department. She relapsed after the first time the Department removed B.S.1 because she believed she had a relationship problem, not a drug problem. She thought if she ended the relationship, her problems would go away. B.S. again relapsed in 2015, five years later, leading to her second case with the Department. She tested positive for methamphetamines on a swab test even though she stated that she last used methamphetamine a month before the test.

In both removals, B.S.'s services included outpatient drug rehabilitation. Approximately eighteen months later, B.S. again relapsed, testing positive for methamphetamine. M.R. also tested positive for methamphetamines, an admitted escalation of B.S.'s drug problem from the previous two cases. Hannah Atkinson, a Department caseworker, stated that after the third case began, B.S. tested negative for drugs on October 2, 2017. Atkinson testified that B.S. tested positive for methamphetamines and amphetamines in December 2017, February 2018, and March 2018. Moreover, Atkinson said that she had problems with B.S. submitting to drug testing on and off during the case. She stated that at one point, the trial court had to order B.S. to submit to drug testing and the Department had to request that B.S. be ordered not to manipulate her hair for tests.

According to B.S., she relapsed between the second and third cases because she stopped attending meetings and worked a lot. She denied using methamphetamines more than once in May 2017 before the third case. B.S. said that she relapsed in December 2017 because the holidays were "rough," and she missed her children. She also denied ever using drugs while her children were in her physical possession.

However, B.S. attended Substance Abuse Felony Punishment Facility (SAFPF) drug rehabilitation in 2012, and two outpatient rehabilitations during the first two cases in 2009 and 2015. She stated that she "went through the motions" during her SAFPF rehabilitation, believing that it did not apply to her. Even though she attended at least three substance abuse rehabilitations, she relapsed at least five times since 2004. Moreover, her last two relapses were less than a year apart. Atkinson believed that B.S. was very unstable with a pattern of on and off drug use. As the attorney ad litem pointed out, it took seven months for B.S. to stop testing positive for methamphetamines even though it was the third time her children were removed from her care. The attorney ad litem believed that B.S. loved her children, but loved drugs more, and the CASA volunteer questioned whether she loved her children or drugs more.

B.S. was in inpatient substance abuse therapy for eighteen days in July 2018. She has been clean since that time and believed that she was self-aware. She said she reduced her "triggers" for

using drugs by changing her career, becoming more stress-free, and lowering her income and expenses. She attends Narcotics Anonymous, Alcoholics Anonymous, and Celebrate Recover, and has a church family. However, the CASA volunteer did not believe that eighteen days of inpatient rehabilitation would change a lifetime of drug use or that anyone could guarantee that B.S. could remain clean in the future.

*Stability of Home.* Although B.S. has an adequate home, her employment has been sporadic. She has lived in three places in the last two years and has not maintained employment for more than a few weeks in the last year. B.S. was unemployed for six months prior to July 2018. From August 2018 through the end of October 2018, she had three jobs, quitting the first one after one week, the second one after breaking a toe, and had the last job for a few weeks before trial. The CASA volunteer described her as "resourceful," and stated that B.S. was capable of providing a safe and stable environment for the children for short periods of time. According to the CASA volunteer, when B.S. decides that it was "crucial," as in the "11th hour of a removal case," she will stop using drugs and try to secure a home and job. However, he said, some event in her life will trigger a need for drugs, resulting in a downward spiral. He testified that the children do not need to be put through more "turmoil," noting that B.S.1 has been removed from her care three times, and M.R. twice, even though he is just four years old.

**Conclusion**

From the above evidence, a reasonable fact finder could have determined that B.S. has a long history with methamphetamine use, her relapses became closer and closer together, her younger child tested positive for methamphetamines during the current case, and she tested positive for methamphetamines even after the Department removed her children in the current case. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). The fact finder could have also formed a firm belief or conviction that B.S. did not understand that her community supervision could be revoked if she tested positive for drugs again, thereby violating her community supervision, that her children had been removed from her care multiple times for drug use, that she attended drug rehabilitation three times before the current case, and that her home environment was unstable. *See id.* Therefore, we hold that the evidence, viewed in the light most favorable to the finding, was sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that B.S. engaged in conduct or knowingly placed the children with persons who

engaged in conduct that endangered the physical or emotional well being of the children. *See **In re J.F.C.***, 96 S.W.3d at 266.

Although B.S. argued that there is no evidence admitted at trial to support termination, including the service plan and drug tests, this evidence is not so significant that a reasonable trier of fact could not have reconciled the evidence in favor of its finding and formed a firm belief or conviction that B.S. engaged in conduct, or knowingly placed the children with persons who engaged in conduct, that endangered the physical or emotional well being of the children. *See **In re C.H.***, 89 S.W.3d at 25.

Therefore, we hold that the evidence is legally and factually sufficient to support termination of B.S.'s parental rights under subsection (E) of Texas Family Code Section 161.001(b). Accordingly, we overrule B.S.'s sole issue as to subsection (E) of Texas Family Code Section 161.001(b).[3]

### BEST INTEREST OF THE CHILD

In her sole issue, B.S. also argues the evidence is legally and factually insufficient to support a finding that termination of her parental rights is in the children's best interest. In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. ***Holley v. Adams***, 544 S.W.2d 367, 371-72 (Tex. 1976).

The family code also provides a list of factors that we will consider in conjunction with the above-mentioned ***Holley*** factors. *See* TEX. FAM. CODE ANN. § 263.307(b) (West Supp. 2018). These include (1) the child's age and physical and mental vulnerabilities; (2) the magnitude, frequency, and circumstances of the harm to the child; (3) the results of psychiatric, psychological,

---

[3] Because we conclude that the evidence is legally and factually sufficient to support termination of B.S.'s parental rights under subsection (b)(1)(E), we need not address her issue regarding subsections (b)(1)(D) and (b)(1)(O) of Section 161.001(b)(1). *See* TEX. FAM. CODE ANN. § 161.001(b)(1); TEX. R. APP. P. 47.1.

or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (4) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (5) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (6) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (7) whether the child's family demonstrates adequate parenting skills; and (8) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* § 263.307(b)(1), (3), (6), (8), (10), (11), (12), (13).

The evidence need not prove all statutory or *Holley* factors in order to show that termination of parental rights is in a child's best interest. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.–Houston [14th Dist.] 2003, no pet.). In other words, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d at 814. Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *In re M.R.J.M.*, 280 S.W.3d at 507. But the presence of scant evidence relevant to each factor will not support such a finding. *Id.* Evidence supporting termination of parental rights is also probative in determining whether termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28-29. We apply the statutory and *Holley* factors below.

## Analysis

The evidence discussed above shows that B.S. has a history of drug use, her children have been removed from her care multiple times because of drug use, she is currently under community supervision, she relapsed at least five times since 2004, most recently twice in the past year, and she has been to outpatient rehabilitation twice, SAFPF once, and inpatient rehabilitation once.

Regarding the children, B.S.1 is described as a very bright child, a wonderful academic student, makes straight A's, and is an avid reader. He is learning to play the trumpet and is in fifth grade. B.S.1 is attending counseling. M.R. is four years old and "full of life." Both children have been through considerable emotional trauma. The children are in the same foster home that they were in during the second removal. According to the CASA volunteer, M.R. spent almost more time with his foster family than with his mother.

Regarding B.S.1's wishes, the CASA volunteer asked B.S.1 if he understood why he was in foster care. B.S.1 said that his "mother uses drugs." The CASA volunteer recently told B.S.1 that the trial court would make a decision whether to return him to his mother or find a family to adopt him. He needed to know what B.S.1 thought. He said that B.S.1 looked at him and, with his eyes watering, told the CASA volunteer that he wanted to stay with his foster family. According to the CASA volunteer and the attorney ad litem, B.S.1 understood the consequences of the decision, what it meant to be adopted, and comprehended that there was a possibility that he may not see his mother again. However, B.S.1 wanted he and his brother to be adopted. B.S. stated that she wanted M.R. returned to her, but would not force B.S.1 to return until he was ready. She understood that he may be angry with her.

According to Atkinson, B.S. did not complete her service plan. She completed a parenting class, psychological evaluation, and a few ETCADA[4] assessments. However, B.S. did not complete substance abuse counseling or individual counseling even though Atkinson changed counselors in order to accommodate B.S.'s work schedule and living arrangements. B.S. denied missing appointments with the substance abuse counselor, but admitted missing a few appointments with the individual counselor. She complained that the service plan interfered with her work hours. According to the CASA volunteer, B.S. began to take advantage of her service plan but the services were eventually cancelled due to a lack of attendance. He said that B.S.'s answers regarding why she missed appointments "varied[d] upon the day and the issue and on and on." He characterized her excuses as "anybody but me." B.S. stated that she was willing to complete her services and was compliant. She stated that the drug testing facility was in a different city even though she admitted that it was moved to accommodate her.

B.S. also violated requirements that she not bring another person to visitations with her children, bringing two men to the visitations on three separate occasions. The CASA volunteer testified that B.S. was very involved with the children during visitations. However, he characterized their relationship as more of a teenage companion than a mother. B.S. stated that she never "beat" her children and that her children never went without food or a home. She said that she put her children first although she admitted that providing them with food and shelter was permission to give herself a "simple pleasure."

---

[4] ETCADA stands for "East Texas Council on Alcoholism and Drug Abuse"

Regarding B.S.'s drug use, she stated that she learned from inpatient rehabilitation that methamphetamine's effect on her personality and perception of reality was "selfishness." She also stated that one of her "triggers," the uncertainty of her and her children's future, was reduced. B.S. stated that when she is feeling stressed, it will not be the magnitude of her previous stresses because she lowered her income and living expenses. B.S. could not tell the trial court if she would relapse again, stating that she could not predict the future. When she is working and making money, she said, she does not want drugs. She did not believe that losing her current job was a possibility.

Atkinson believed that B.S. was a continuing danger to her children because she has a pattern of on and off drug use with no stability. The CASA volunteer testified that "we" cannot take a chance and put the children through more turmoil. He believed that there was a long term danger of returning the children to B.S. even though she could stop using drugs for short periods of time. The CASA volunteer believed that B.S.'s parental rights should be terminated. The attorney ad litem believed that it was in the children's best interest to terminate B.S.'s parental rights.

## Conclusion

After viewing the evidence in the light most favorable to the finding and applying the statutory and *Holley* factors, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of B.S.'s parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 266. Although some evidence might weigh against the finding, such as B.S. being clean since her inpatient drug rehabilitation, this evidence is not so significant that a reasonable fact finder could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that terminating B.S.'s parental rights is in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 266. Accordingly, we overrule B.S.'s sole issue regarding best interest.

### DISPOSITION

Having overruled B.S.'s sole issue, we *affirm* the judgment of the trial court.

GREG NEELEY
Justice

Opinion delivered May 15, 2019.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

12



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MAY 15, 2019**

**NO. 12-18-00326-CV**

**IN THE INTEREST OF B.S. AND M.R., CHILDREN**

Appeal from the 392nd District Court
of Henderson County, Texas (Tr.Ct.No. FAM17-0578-392)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*